UNITED STATES of America,
Plaintiff–Appellee,

v.

John T. SCHILLING and Robert
J. Schilling, Defendants–
Appellants.

Nos. 96–4160, 96–4161.

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1997.

Decided April 15, 1998.

Andrew B. Baker, Jr. (argued), Office of the United States Attorney, Dyer, IN, for Plaintiff–Appellee.

Nick J. Thiros (argued), Cohen & Thiros, Merrillville, IN, for Defendant–Appellant.

Before POSNER, Chief Judge, and COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Brothers John and Robert Schilling appeal the trial court's decision that the Government did not breach the plea agreement.

In the Plea Agreement, the Schillings agreed to plead guilty to a conspiracy to defraud the U.S. Treasury Department ("Treasury") and admitted intentionally failing to report the sale of 300,000 gallons of diesel fuel from their company's federal excise tax returns for the period from January 1987 through December 1988. The Government, for its part, agreed to drop seven counts against the Schillings and agreed to recommend that the Schillings be sentenced to the minimum sentence under the applicable sentence guideline range, pursuant to Fed.R.Crim.P. 11(e)(1)(C). The Government also agreed to recommend a two-level reduction in the guideline offense level for acceptance of responsibility, agreed not to recommend sentencing enhancement for obstruction of justice [1] or for the use of sophisticated means to impede discovery of the crime,[2] and agreed that it would make no further recommendations as to the specific sentence within the applicable guideline range.[3]

Also in the Plea Agreement, the Schillings agreed that the Government reserved the right to "tell the Court the good things about me and the bad things about me," to present evidence which may affect the sentencing guideline range, and, to "fully apprise the Court of the nature of the criminal conduct."

---

1.  ¶ 4(a) of Count One of the indictment charged the Schillings with obstructing justice.

2.  ¶ 5(G) charged the Schillings with rolling back the meters on their gas station's diesel fuel pumps, and ¶ 5(C) alleged that the Schillings established a dummy company (Delta Fuel) to avoid diesel excise taxes; these allegations put at issue the "sophisticated means" sentencing enhancement.

3.  In the Schillings' presentence reports, the probation department did not agree with two of the U.S. Attorney's three recommendations. While the probation department recommended that the Schillings' sentence not be enhanced for obstruction of justice, it did recommend that their sentences be enhanced for using sophisticated means and for failing to accept responsibility.

At the Schillings' sentencing hearing, the trial judge allowed the Government, over the defendants' objection, to present evidence demonstrating that the defendants' criminal conduct involved more than the 300,000 gallons of diesel fuel that they had admitted to. Based on the evidence presented, the trial court found that the true quantity of unreported fuel caused a tax evasion of $1,000,635: the federal government had been deprived of $392,622 in excise taxes, and the States of Illinois and Indiana had been deprived of $608,013 in excise taxes.[4] Obviously, the Schillings faced a sentencing guideline range more severe than the one they would have faced had the court determined the gallonage to total 300,000 (under table 2T4.1 of the Sentencing Guidelines, the offense level for $90,000 of unpaid taxes (300,000 gallons taxed at 15% federal and 15% state) would be 12). The base offense level for unpaid taxes in excess of one million dollars—which is what the district court decided as the correct amount—was 16. The trial judge added two points for "using sophisticated means to avoid discovery," raising the total offense level to 18. An offense level of 18 gives a sentencing range of 27 to 33 months imprisonment; the trial judge sentenced the defendants to the minimum, 27 months.

The Schillings argue that the Government breached the Plea Agreement by introducing evidence of fuel sales totaling more than 300,000 gallons, and further claim that the trial court erred when, after the alleged breach occurred, they were not permitted to withdraw their guilty pleas.

We affirm the trial court's finding that the Government did not breach the Plea Agreement, and also agree with the trial court's decision to deny the Schillings' request to withdraw their guilty pleas.

## I. BACKGROUND

Even though diesel fuel and heating oil are the same substance, if the substance is sold at a gas station as diesel fuel, the excise tax is significantly greater than if it were marketed as heating oil.

Up until April 1988, gas station owners selling diesel fuel were responsible for collecting the federal diesel excise tax from the purchasers. The gas station owners were required to pay the taxes, listing the total amount of their diesel sales on quarterly federal excise tax returns. Effective April 1, 1988, the law transferred the collection responsibilities—rather than the gas station owner doing the collecting, the wholesaler now collected the tax when selling the fuel to the gas station owner. Retailers who purchase the fuel intending to sell it as heating oil avoid the higher diesel tax by certifying to the distributor that the fuel will be used for heating oil, agriculture or other exempt use.

In 1988, the Schillings, who had been in the fuel industry for twenty years, obviously had knowledge of the existing laws and the difference in taxes between diesel fuel and heating oil. The Schillings owned and operated several fuel-related outlets during this period of time, including RKS Trucking, R & J Enterprises, and the Schilling Brothers Truck Stop in St. John, Indiana. In 1987 and 1988, the Schillings' diesel fuel businesses obligated them to pay a 15.1 cent/gallon federal excise tax and similar state excise taxes to the States of Indiana and Illinois.

According to the indictment, to which the Schillings pled guilty, from January 1987 through December 1988 the Schillings engaged in a continued pattern of fraud on their fuel sales, where they collected diesel excise tax from their customers but failed to remit the proper taxes, or records of the sales, to state and federal governments. The trial court found that this conspiracy had the following components.

*Richard Statt.* From January through August 1987, the Schillings purchased at least 248,574 gallons of diesel from one Richard Statt, who owned two small oil companies

---

4. The district court judge found the defendants failed to report to the federal government 2,600,154 gallons of petroleum; with a 15.1% tax rate, the total lost to the federal government was $392,622. He found that the defendants failed to report 3,106,226 gallons to the State of Illinois; with a 15.5% tax rate, the total lost to Illinois was $481,465. And, he found that they failed to report 843,654 gallons to the State of Indiana; with a 15.0% tax rate, the total lost to Indiana was $126,548.

named R & D Oil and Decker Oil, in Gary, Indiana. The Schillings paid cash for this fuel and transported it to their truck stop. Although the Schillings collected excise taxes from truckers who purchased this diesel fuel at their truck stop, they neither reported this diesel fuel on their quarterly tax returns nor paid the proper amount of federal or state excise taxes.

*The Conoco Pipeline.* Between the spring and fall of 1987 the Schillings purchased between 20,000 and 25,000 gallons of diesel from the manager of the Conoco pipeline terminal in Griffith, Indiana. The Schillings were fully aware of the fact that the Conoco manager routinely and illicitly skimmed fuel from the pipeline. He sold it to the Schillings for half the market value. The Schillings sold this fuel at their truck stop, again pocketing the unreported excise taxes.

*Carson Petroleum.* The Schillings also purchased diesel fuel from an Indiana company named Carson Petroleum. The Schillings were regular customers of Carson and in fact reported the bulk of their purchases on their quarterly excise tax returns. However, they did not report all of the purchases on the excise tax returns: they omitted 74,051 gallons.

*Delta Fuel/Ameropan and U.S. Oil.* The Schillings utilized a shell corporation known as Delta Fuel to take advantage of the difference in excise taxes between diesel fuel and heating oil. Using Delta, the Schillings pretended to be heating oil dealers while purchasing the fuel without paying the diesel excise tax. They then sold the fuel as diesel fuel and retained the amount due as taxes for themselves. In 1987 and 1988, the Schillings used Delta to purchase 408,000 gallons of fuel from Ameropan and 93,000 gallons from U.S. Oil.[5] The Schillings filed the proper forms with the respective companies stating that the fuel was to be used for heating oil. The Schillings' certifications were fraudulent; the Schillings intended to and in fact did sell the fuel as diesel at their truck stop. After collecting the excise taxes and keeping it for

themselves, they carried out their fraud scheme and failed to report these sales on their quarterly federal excise tax returns.

*Delta Fuel/Wright Industries.* In their most brazen and sophisticated scheme, the Schillings, using their shell company (Delta), purchased 3,106,226 gallons of fuel in 1988 from a wholesaler and sold it to Wright Industries, an Illinois company. In this scheme they sold the fuel for seven cents *less* than what they paid for it but suffered no loss when they bought the fuel because they bought it without paying taxes on it (because they certified that they would sell it as heating oil). When they illicitly turned around and sold the fuel as diesel, they *collected* (and failed to report) the taxes due. Because the pricing shortfall was only 7 cents, and because the taxes that they pocketed totaled 30.6 cents per gallon (15.1 cents per gallon federal excise tax and 15.5 cents per gallon Illinois excise tax), they made quite a profit on the sale.

After an I.R.S. investigation into their activities, a federal grand jury returned an eight-count indictment against the Schillings on May 19, 1993. Count One charged them with conspiracy to defraud the U.S. Treasury in violation of 18 U.S.C. § 371 by means of filing false federal excise tax returns, which, in turn, contravenes 26 U.S.C. § 7206(1) and 7206(2). The initial count of the Indictment listed numerous overt acts undertaken by the appellants in furtherance of the conspiracy.[6] While some of the identified acts involved an unknown, "to be determined" amount of fuel, the others alleged, in aggregate, that appellants had trafficked in more than one million gallons of unreported petroleum.

The remaining counts of the Indictment involved the Schillings' filing of false excise tax returns. Counts Two and Three charged Robert Schilling with making and subscribing false quarterly Federal Excise Tax Returns. Counts Four and Five charged John Schilling with aiding and abetting the making of false quarterly Federal Excise Tax Re-

---

5. The record is unfortunately sparse as far as revealing the location, type of business, or even the full names of "Carson Petroleum," "Ameropan," and "U.S. Oil."

6. The overt acts included, among other things, the conspiracy with the Conoco pipeline manager, the misuse of Delta Fuel, and the unreported sales to Carson Petroleum.

turns. And, Counts Six, Seven and Eight charged the Schillings with the making of false Quarterly Federal Excise Tax Returns in violation of 26 U.S.C. § 7206(2).

On June 25, 1993, the Schillings entered a plea of not guilty to all charges. Thereafter, their attorneys, acting on behalf of the Schillings, negotiated a plea agreement. On May 31, 1995, pursuant to individual Petitions to Enter a Change of Plea (signed), the Schillings pled guilty to Count One of the Indictment. Paragraph 9(a) of each petition provided:

I will plead GUILTY to Count 1 of the Indictment charging me with conspiring to defraud the United States Treasury Department by impeding the computation, assessment and collection of federal diesel fuel excise taxes and willfully, [sic] making and subscribing to false quarterly Federal Excise Tax returns, in violation of Title 18, United States Code, Section 371, because I am, in fact, GUILTY.

Paragraph 9(b) of each petition provided:

In so pleading GUILTY, I acknowledge that together with my brother [Robert J./John T.] and other coconspirators, I conspired to defraud the United States Treasury Department by purchasing and selling 300,000 gallons of diesel fuel which I intentionally did not include on the Federal Excise Tax Returns filed for R & J Enterprises from January 1987 through December 1988. In furtherance of that conspiracy, during the years 1987 and 1988, my brother and I maintained false records of inventory, sales, fuel purchases and other expenses and failed to report to and pay to the Department of Treasury the proper amount of Federal diesel excise tax due.

In paragraphs 4, 6–9, 12, and 13 of the Plea Agreement, which the Schillings signed, the Schillings made clear that they understood the Plea Agreement and entered into it freely and voluntarily.

In exchange for the guilty pleas to Count One, the Government agreed to a number of concessions:

1) to dismiss Counts Two through Eight of the indictment;

2) pursuant to Fed.R.Crim.P. 11(e)(1)(B), to

   a) recommend a two-level reduction in the guideline offense level for acceptance of responsibility;

   b) not to recommend enhancement of the sentence for obstruction of justice;

   c) not to recommend enhancement of the sentence for sophisticated means to impede discovery;

3) to recommend that, pursuant to Fed. R.Crim.P. 11(e)(1)(C), the Schillings would be sentenced to the minimum sentence under the applicable sentence range;

4) to make no recommendation as to the specific sentence within the applicable guideline range beyond the recommendations contained in the agreement.[7]

Plea Agreements, ¶¶ 9(c), (h) and (k).

The Schillings agreed that the Court would not be bound to follow the Government's recommendations made pursuant to Fed. R.Crim.P. 11(e)(1)(B), and each Schilling agreed that "I HAVE NO RIGHT TO WITHDRAW MY GUILTY PLEA if the Court decides not to accept" these recommendations.

Although the Government made a number of promises in the Plea Agreement, it never agreed to withhold from the Court information regarding what exactly the Schillings did, as the defendants contend. In fact, the contrary was true. The Plea Agreement specifically reserved for the Government the right to fully inform the court about the Schillings' criminal conduct:

I understand that the United States of America reserves the right to tell the Court the good things about me and the bad things about me; the United States of America also reserves the right to present evidence which may affect my sentencing

7. This appeal contains no allegation that the Government failed to fulfill any of the promises contained in ¶¶ 9(c), (h) and (k) of the Plea Agreement. This appeal centers solely on the allegation that the Government's introduction of evidence of more than 300,000 gallons constituted a breach.

range; and the United States of America reserves the right to fully apprise the Court of the nature of the criminal conduct. . . .

The Government argues that this provision allowed them to submit to the court evidence establishing that more than 300,000 gallons went unreported.

On March 25, 1996, prior to the sentencing hearing (July 25, 26 and 29, 1996), the Schillings filed a motion in limine seeking to prevent the Government from introducing evidence demonstrating that the Schillings' tax evasion involved gallonage much greater than 300,000.[8] The Schillings claimed that, if the Government followed through on its intent to advise the court that the total gallons purchased and sold exceeded 300,000, the Government would be in breach of the Plea Agreement. In the alternative, the Schillings asked leave of the court to withdraw their guilty plea. The Government, opposing the Schillings' motions, argue that there was no breach, for the Plea Agreement specifically reserved the Government's right to apprise the court of the Schillings' conduct.

On June 17, 1996, the district court denied the Schillings' motions. The Government argues and the district court held that the Government's introduction of the disputed evidence did not constitute a breach because the Plea Agreement had specifically reserved for the Government the right to introduce evidence regarding the full extent of the Schillings' criminal conduct. The trial court also found that the Schillings, at the time of their change of plea hearing (May 31, 1995), had reiterated in open court their consent to the Government's introduction of such evidence. The trial court, at the hearing, made a very complete record, in which the Schillings stated:

> COURT: And can the United States Attorney also present evidence to this Court at your sentencing that may effect [sic] your sentencing guideline range?
>
> [John Schilling]: Yes, Your Honor.
>
> COURT: Can the United States Attorney also tell this Court the nature of your criminal conduct?
>
> [John Schilling]: Yes, Your Honor.
>
> :    .    .    .    .
>
> COURT: Okay. At the time of your sentencing, can the United States Attorney also present evidence to this Court that may effect [sic] your sentencing guideline range?
>
> [Robert Schilling]: Yes.
>
> COURT: And also can the government at the time of your sentencing fully inform the court of the nature of your criminal conduct?
>
> [Robert Schilling]: Correct.[9]

The district court, in addition to admitting the disputed evidence, denied the Schillings' motion to withdraw their guilty pleas, finding that the Schillings had not presented a "fair and just reason" for withdrawing their pleas—the standard required by Fed. R.Crim.P. 11(e).

The trial judge, in an effort to make a complete record, saw fit to conduct evidentiary hearings on three separate days. On July 25, 26, and 29, 1996, the district court held evidentiary hearings on sentencing issues.

---

8. From the record, it appears that via the Government's Santiago Proffer, filed February 29, 1996, the Schillings first became aware that the Government planned to introduce this evidence at the sentencing hearing.

9. At the same hearing, while under oath, the Schillings repeated their admission to the charges contained in Count One of the Indictment. Because Count One alleged that the conspiracy extended to well over 1,000,000 gallons, the Schillings therefore admitted the veracity of the Government's claim that their criminal conduct included much greater than 300,000 gallons.

> COURT: What is it that you're about to do here this morning concerning Count 1 of the indictment which charges you with conspiracy to defraud the United States Treasury Department?
>
> [Robert Schilling]: Plead guilty.
>
> COURT: And why are you going to plead guilty to that crime?
>
> [Robert Schilling]: Because that's the crime that my brother and I did.
>
> .    .    .    .    .
>
> COURT: [A]re you telling me that you did all those things that the Government has said that you did that are set forth in Count 1 of the indictment?
>
> [John Schilling]: Yes, your honor.

During the hearings, the trial judge heard the Government's evidence that the Schillings' conspiracy included far more than the 300,000 gallons that they referred to in the Plea Agreement. The defense had ample opportunity to attempt to refute the Government's evidence during the sentencing hearing but failed to do so concerning the one million gallons.

On December 3, 1996, the court sentenced the Schillings to 27 months in prison. The district court determined that the Schillings had deprived the I.R.S. of diesel fuel excise taxes on 2,600,154 gallons and had inflicted a loss of $392,622 on the Government. The district court added this loss to the losses suffered by the States of Indiana and Illinois, which it deemed to total $608,013 (based on unreported sales of 3,949,880 gallons). The combined tax loss (i.e., losses suffered by the federal government in addition to the losses suffered by Illinois and Indiana) totaled $1,000,635 and thus, pursuant to U.S.S.G. § 2T4.1, yielded a base offense level of 16. The trial judge did not accept the Government's recommendation that the sentences be reduced for acceptance of responsibility and, also contrary to the Government's recommendation, imposed a two-level enhancement for use of sophisticated means. The trial judge did accept the Government's recommendation that the base offense level not be increased for obstruction of justice. The trial court ended up with an offense level of 18, with a sentencing range of 27 to 33 months. Acting pursuant to the Plea Agreement which recommended the minimum amount, the trial court sentenced the Schillings to 27 months.

On appeal, the Schillings renew their argument that the Government breached the Plea Agreement by introducing evidence that the conspiracy included more than 300,000 gallons of diesel fuel.[10] They also claim that the trial court should have allowed the Schillings to withdraw their guilty pleas.

We affirm the decisions of the trial court.

## II. ISSUES

This appeal addresses two issues: (1) whether the Government breached the Plea Agreement when it introduced evidence that the Schillings' criminal conduct encompassed more than 300,000 gallons of diesel fuel; (2) whether the district court erred when it refused to allow the Schillings to withdraw their guilty pleas.

## III. DISCUSSION

### A. Standard of Review

Because the facts of this case are undisputed, we are asked to review a conclusion of law, and the standard of review is de novo. *See United States v. Calabrese*, 645 F.2d 1379, 1390 (10th Cir.1981) ("If the pleadings reveal no disputed factual issues, ... the court may determine the issue of breach as a matter of law"); *Thomas & Betts Corp. and Thomas & Betts Holdings, Inc. v. Panduit Corp.*, 138 F.3d 277, 283 (7th Cir.1998) ("Since this is a conclusion of law, we examine the district court's holding de novo"), citing *In the Matter of 203 N. LaSalle Street Partnership*, 126 F.3d 955, 961 (7th Cir. 1997).

When reviewing a district court's decision to deny a defendant's motion to withdraw a guilty plea, the standard of review is "abuse of discretion." *Lee v. United States*, 113 F.3d 73, 76 (7th Cir.1997).

### B. Plea Agreements

"Plea agreements are contracts and their content and meaning are determined according to ordinary contract principles." *United States v. Ingram*, 979 F.2d 1179, 1184 (7th Cir.1992). However, plea agreements are "unique contracts and the ordinary contract principles are supplemented with a concern that the bargaining process not violate the defendant's right to fundamental fairness under the Due Process Clause." *United States v. Rourke*, 74 F.3d 802, 805 (7th Cir.),

---

**10.** The Schillings do not submit that the district court acted improperly in considering the Government's evidence; the Schillings concede that "The District Court also had the right, as it noted in its sentencing Memorandum, to consider gallons over and above the 300,000 for purposes of sentencing." The Schillings' argument rests, rather, on their claim that "the *Government* would not introduce evidence of increased substantially higher gallons."

*cert. denied,* 517 U.S. 1215, 116 S.Ct. 1840, 134 L.Ed.2d 942 (1996) (citation and quote omitted). "The government must fulfill any promise that it expressly or impliedly makes in exchange for a defendant's guilty plea." *United States v. Ingram,* 979 F.2d 1179, 1184 (7th Cir.1992), *cert. denied,* 507 U.S. 997, 113 S.Ct. 1616, 123 L.Ed.2d 176 (1993), citing *Santobello v. New York,* 404 U.S. 257, 261, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). "The 'Government is to be held to the literal terms of the plea agreement.'" *United States v. Ataya,* 864 F.2d 1324, 1330 (7th Cir.1988), quoting *United States v. Bielak,* 660 F.Supp. 818, 826 (N.D.Ind.1987), and citing *United States v. Fields,* 766 F.2d 1161, 1168 (7th Cir.1985), *United States v. Travis,* 735 F.2d 1129, 1132 (9th Cir.1984), and *United States v. Crusco,* 536 F.2d 21, 26 (3d Cir.1976). "[T]o insure the integrity of the plea bargaining process, the 'most meticulous standards of both promise and performance must be met by the government.'" *United States v. Jimenez,* 992 F.2d 131, 134 (7th Cir.1993), quoting *United States v. Bowler,* 585 F.2d 851, 854 (7th Cir.1978). "A plea induced by an unfulfillable [11] promise is no less subject to challenge than one induced by a valid promise which the Government simply fails to fulfill." *United States v. Cook,* 668 F.2d 317, 320 (7th Cir.1982). "[T]he strict fulfilment of prosecutorial promises emanates as a requirement from the significant consequences of a guilty plea—the waiver of important constitutional rights and the 'adjudicative element' that is inherent in the plea." *Ataya,* 864 F.2d at 1330 (citations omitted).

■ Nonetheless, as with a contract, a party's rights under a plea agreement are limited by what the parties in fact agreed to.

*Jimenez,* 992 F.2d at 134, citing *United States v. Benchimol,* 471 U.S. 453, 105 S.Ct. 2103, 85 L.Ed.2d 462 (1985) (per curiam) and *United States v. Verrusio,* 803 F.2d 885, 889 n. 3 (7th Cir.1986). "We review the language of the plea agreement objectively and hold the government to the literal terms of the plea agreement." *United States v. Williams,* 102 F.3d 923, 927 (7th Cir.1996). A plea agreement, like any contract, "'should be construed as a whole, so that various provisions of the contract are harmonized and none are rendered meaningless.'" *Ataya,* 864 F.2d at 1335, quoting *In re Chicago, Rock Island and Pac. R.R. Co. v. Richmond, Fredericksburg and Potomac R.R. Co.,* 835 F.2d 682, 686 (7th Cir.1987).

■ In arriving at its determination regarding breach, the court must examine whether there has been a "substantial breach" of the plea agreement, *id.* at 1330, citing *United States v. Wood,* 780 F.2d 929, 931–32 (11th Cir.), *cert. denied,* 479 U.S. 824, 107 S.Ct. 97, 93 L.Ed.2d 48 (1986) (other citations omitted), "in light of the parties' reasonable expectations" upon entering the agreement. *Id.* (citation omitted).

Our analysis, then, centers on the "reasonable expectations" that the Plea Agreement provided to the Schillings.

### C. Analysis

#### 1. Breach of the Plea Agreement.

■ The Schillings claim that the Government breached its Plea Agreement because "The essence of the Defendants' plea agreements was that they were pleading guilty to defrauding the Government of excise taxes

---

**11.** An example of an unfulfillable promise would have been if the Government in this case *had* promised to withhold from the trial court evidence showing that the Schillings' unreported sales totaled much greater than 300,000 gallons. After all, the Government does not have a right to withhold from the sentencing judge all the salient facts of the defendant's conduct: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661, *quoted in United States v. Taylor,* 72 F.3d 533, 543 (7th Cir.1995).

*See also United States v. Cook,* 668 F.2d 317, 320 n. 4 (7th Cir.1982) (the very nature of the sentencing process precludes an attorney for the Government promising to withhold relevant information from the sentencing court); *United States v. Block,* 660 F.2d 1086, 1091–92 (5th Cir.1981) (a government agreement to withhold relevant facts from the court would "not only violate[] a prosecutor's duty to the court but would result in sentences based upon incomplete facts or factual inaccuracies, a notion that is simply abhorrent in our legal system"), *cert. denied,* 456 U.S. 907, 102 S.Ct. 1753, 72 L.Ed.2d 164(1982), *cited with approval by United States v. Billington,* 844 F.2d 445, 448 n. 4 (7th Cir.1988).

relating to 300,000 gallons of diesel fuel" and that, while "[i]t is true that the Government did not in the plea agreements specifically state that it would limit itself to 300,000 gallons in any arguments or evidence it presented to the District Court," still, "[s]uch a promise, however, is implicit in the language of paragraph 9(b) and its context." By agreeing to a guilty plea covering 300,000 gallons, the Schillings claim, they had a "reasonable expectation" that the Government would not introduce evidence regarding an amount in excess of 300,000 gallons.

We agree with the district court that, in view of the fact that the Government explicitly reserved its right to apprise the court of "the totality of the Schillings' conduct," and since the Schillings had entered a plea of guilty to Count One of the Indictment, and because Count One alleged the defendants' fraudulent scheme was in excess of one million gallons, an expectation of only 300,000 gallons on the part of the Schillings was not reasonable. The trial judge made a complete record: he questioned the defendants as to their understanding of the Plea Agreement. Also, the Schillings signed the Plea Agreement and stated that they fully understood its contents. We thus affirm the district court's decision and hold that the Government did not breach the Plea Agreement by introducing evidence that the Schillings intentionally failed to report over a million gallons of diesel sales.

In ¶ 9(*l*) of the Plea Agreement, the Government explicitly reserved its right to tell the court everything that happened as far as Count One. Paragraph 9(*l*) read:

> I understand that the United States of America reserves the right to tell the Court the good things about me and the bad things about me; the United States of America also reserves the right to present evidence which may affect my sentencing guideline range; and the United States of America reserves the right to fully apprise the Court of the nature of the criminal conduct....

At the May 31, 1995 change of plea hearing, the court ensured that the Schillings knew what they were doing in ¶ 9(*l*) and that their agreement was voluntary:

COURT: At the time of your sentencing, can the United States attorney tell this Court some things about you?

[Robert Schilling]: Yes, they could.

COURT: What kind of things?

[Robert Schilling]: Good or bad.

COURT: Okay. I assume there is a little bit of both, right?

[Robert Schilling]: Should be.

COURT: Okay. At the time of your sentencing, can the United States Attorney also present evidence to this Court that may effect [sic] your sentencing guideline range?

[Robert Schilling]: Yes.

COURT: And also can the Government at the time of your sentencing fully inform this Court of the nature of your criminal conduct?

[Robert Schilling]: Correct.

.    .    .    .    .

COURT: Is the United States Attorney at the time of your sentencing going to tell this Court some things about you?

[John Schilling]: Yes, your Honor.

COURT: What kind of things?

[John Schilling]: I don't know. Good, bad.

COURT: Okay.

[John Schilling]: In between.

COURT: Good things, bad thing?

[John Schilling]: Yeah.

COURT: Okay.

[John Schilling]: Yes, your Honor.

COURT: And can the United States Attorney also present evidence to this Court at your sentencing that may effect [sic] your sentencing guideline range?

[John Schilling]: Yes, your Honor.

COURT: Can the United States Attorney also tell this Court the nature of your criminal conduct?

[John Schilling]: Yes, your Honor.

The Schillings make no effort to explain how, in light of the Government's reservation in ¶ 9(*l*), they could have had a reasonable expectation that the Government would not apprise the court fully of the nature of the Schillings' criminal conduct. Indeed, they

would have a hard time doing so: if ¶ 9(*l*) did not give the Government the right to tell the Court about the facts underlying Count One, then it is difficult to fathom what good the language did. *See Thompson v. Amoco Oil Co.*, 903 F.2d 1118, 1121 (7th Cir.1990) ("[W]e try not to interpret contracts in a manner that would render specific contractual language mere surplusage ....."), citing *Nice Ball Bearing Co. v. Lescure*, 227 F.2d 118, 120 (7th Cir.1955). The Government certainly could not "fully apprise" the court of the nature of the Schillings' conduct without telling how many gallons went unreported; that would be like haggling over a car purchase without talking about a price.

We fail to understand the Schillings' argument. Because the Government clearly retained the right to tell the court how many gallons went unreported, the Schillings could have had no reasonable expectation that the Government should be barred from presenting such evidence.

Additionally, the Schillings pleaded guilty, in ¶ 9(a) of the Plea Agreement, to Count One of the Indictment. At their change of plea hearing, they repeated their admission to the charges contained in Count One. *See* footnote 9, above. Count One alleged that the conspiracy extended to well over 1,000,000 gallons. The Schillings could not, on the one hand, confess to a scheme that exceeded 1,000,000 gallons, and, on the other, claim that they had a "reasonable expectation" that the Government would only submit evidence showing that the scheme included 300,000 gallons.

Lastly, the language and context of the Schillings' ¶ 9(b) confession to 300,000 gallons is such that no reasonable person would conclude that this paragraph foisted upon the Government any obligation whatsoever. This is because the language of ¶ 9(b) is different from the language used in the Plea Agreement whenever the Government assumed an obligation. In the Plea Agreement generally, whenever the parties saddled the Government with an obligation, they used particular, unmistakable language: "In consideration of my plea of GUILTY, the government agrees...." This language is used in ¶¶ 9(c), (h), (j) and (k) of the Plea Agreement, and the parties agree that each of these paragraphs contained governmental obligations.

For instance, ¶ 9(c) states *"In consideration of my plea of GUILTY to Count 1 of the indictment, the government agrees* that it will, at the time of sentencing, dismiss Counts [Two through Eight] of the indictment" (emphasis added). Paragraph 9(h) states *"In further consideration for my plea of GUILTY to Count 1, the government, pursuant to Federal Rule of Criminal Procedure 11(e)(1)(B), agrees* to make the following non-binding recommendations: (i) *The government agrees* to recommend a two level reduction for acceptance of responsibility pursuant to § 3E1.1; (ii) *The government agrees* to recommend to the Court that my offense level not be increased under the following section(s) of the guidelines:—3C1.1 (Wilfully Obstructing or Impeding Proceedings);—2T1.1 (Sophisticated means to impede discovery of offense)". Paragraph 9(k) states *"In further consideration of my plea of GUILTY, the United States of America agrees* that it will make no recommendation as to the specific sentence within the applicable guideline range to be imposed upon me for my convictions herein beyond that specified in paragraphs 9(h) and (j) of this petition." And, ¶ 9(j), while referring to Fed. R.Crim.P. 11(e)(1)(C) instead of using "consideration" language, also uses the "agrees" language: "Pursuant to Federal Rule of Criminal Procedure 11(e)(1)(C), *the government agrees* with me that the appropriate disposition of this case is a sentence equal to the minimum of the applicable guideline range...."

Contrast these paragraphs with ¶ 9(b) (the Schillings' admission that they failed to report 300,000 gallons). Paragraph 9(b) does not contain any language about "consideration"; does not contain any language relating to "the Government agrees"; does not even contain any reference to the Government at all. Paragraph 9(b) merely contains an admission, on the part of the Schillings, that 300,000 gallons of petroleum went unreported. A reasonable person, seeing the language set forth in ¶ 9(b) and contrasting this with the phrasing in ¶¶ 9(c), (h), (j), and (k),

would not expect ¶ 9(b) to bind the Government.

### 2. The Judge's Decision to Disallow the Schillings' Motion to Withdraw their Guilty Pleas.

 Federal Rule of Criminal Procedure 32(d) permits withdrawal of a guilty plea upon a showing by the defendant of "any fair and just reason." *See United States v. Abdul,* 75 F.3d 327, 329 (7th Cir.1996), citing *United States v. McFarland,* 839 F.2d 1239, 1241 (7th Cir.), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1750, 100 L.Ed.2d 212 (1988). However, a defendant has no absolute right to withdraw a guilty plea. *See id.* When a defendant wishes to withdraw his plea after he states at a Rule 11 hearing that it was freely and knowingly given, he "faces an uphill battle in persuading the judge that his purported reason for withdrawing his plea is 'fair and just.'" *United States v. Messino,* 55 F.3d 1241, 1248 (7th Cir.1995), quoting *United States v. Trussel,* 961 F.2d 685, 689 (7th Cir.1992).

As stated above, we will reverse the trial judge's refusal to allow the withdrawal of a guilty plea only upon a showing of abuse of discretion. *Lee v. United States,* 113 F.3d 73, 76 (7th Cir.1997); *Abdul,* 75 F.3d at 329. In evaluating the district court's ruling for abuse of discretion, the court's findings regarding whether the defendant has "fair and just" reasons for withdrawal will be upheld unless they are clearly erroneous. *See Abdul,* 75 F.3d at 329.

In the case before us, the Schillings rested their "withdrawal of guilty plea" argument upon their submission that the Government breached its Plea Agreement. Because we have affirmed the district court's finding that the Government did not breach its Plea Agreement, we find that the Schillings have demonstrated no "fair and just" reason for withdrawal of their pleas.

### IV. CONCLUSION

We hold that the district court did not commit clear error when it found that the Government did not breach its obligations under the Plea Agreement. As there was no breach, we also affirm the district court's discretionary decision to refuse the Schillings' request to withdraw their guilty pleas.